597 So.2d 578 (1992)
LOUISIANA POWER & LIGHT COMPANY and Combustion Engineering, Inc.
v.
The PARISH SCHOOL BOARD OF the PARISH OF ST. CHARLES, individually and as collecting agent for the Parish Council of St. Charles, successor to the Police Jury of the Parish of St. Charles and E.H. Flynn, Director of Tax Collections, St. Charles Parish School Board.
No. 91-CA-612.
Court of Appeal of Louisiana, Fifth Circuit.
March 16, 1992.
Rehearing Denied May 18, 1992.
*579 Roy M. Lilly, Jr., Chapman L. Sanford, Sanford & Lilly, a Law Corp., Baton Rouge, for defendants-appellants.
Eugene G. Taggart, Anne L. Lewis, Monroe & Lemann, New Orleans, for plaintiffs-appellees.
Before GRISBAUM, WICKER and GOTHARD, JJ.
GRISBAUM, Judge.
This appeal arises out of a suit which addresses whether Louisiana Power & Light's nuclear fuel assemblies were exempt from local government and school board sales/use and lease taxes owed to the defendants. From a judgment in favor of plaintiffs, defendants appeal. We affirm.
FACTS
Louisiana Power & Light (LP & L) brought nuclear fuel assemblies into St. Charles Parish for use in its nuclear fuel generation facility at Waterford III. This generating station generates electricity by heating water in a boiler which produces steam and then uses the steam to spin a turbine connected to a generator that produces electricity. The nuclear fuel assemblies arrived in St. Charles Parish in four separate shipments:
Batches A, B and CFebruary/March, 1983
Batch DOctober/November, 1986
Batch EMarch, 1988
Batch FAugust, 1989
Nuclear fuel assemblies were shipped to Waterford 3 by C-E, which performs fabrication services on LP & L's converted and enriched uranium. LP & L purchased *580 the natural uranium during the 1970's, and it was subsequently converted and enriched by vendors of those services. Fabrication services transform the converted and enriched uranium into ceramic pellets, which are then placed in long tubes called fuel rods. The fuel rods are then placed into a cage[-]like structure called a fuel assembly. The shipments of fuel to Waterford 3 contained from 84 to 217 fuel assemblies. The total charges associated with the various batches of nuclear, excluding sales/use taxes, were:
Batches A, B and C: $ 61,515,740.19
Batch D: $ 72,814,297.90
Batch E: $ 55,936,470.08
Batch F: $ 67,900,722.72
... After they are used, the fuel assemblies are stored at Waterford 3 in the spent fuel pool. LP & L has contracted with the Department of Energy for the eventual disposal of the fuel.
After the arrival of the first two shipments, the Tax Collector assessed a use tax on the shipments and the taxpayers made payment under protest and timely filed suit to recover. After the arrival of Batches E and F, the taxpayers made additional payments under protest and filed suit to recover. The Tax Collector now claims that LP & L owes additional use taxes and a lease tax on the financing vehicle LP & L used to pay for the fuel.
LP & L financed the nuclear fuel by transactions commonly known as sale/lease-backs, which were structured to give LP & L access to otherwise inaccessible credit markets through corporations created for the sole purpose of financing the costs of the nuclear fuel used at Waterford 3. Whenever LP & L required monies to pay a vendor for uranium or related services, LP & L "sold" the natural uranium or the nuclear fuel to a shell corporationat first, Bayou Fuel, and since 1989, River Fuel. The shell corporations were single[-]purpose corporations owned by investment bankers. The title, but never the possession of the natural uranium or fuel, was transferred to the shell corporation. LP & L received loans equal to the book value of the uranium or fuel, i.e., LP & L's cost. The shell corporations then entered into a paper transaction calling for "lease" payments to them for the nuclear fuel, which never left LP & L's control or possession. The quarterly payments are repayment by LP & L to the shell corporations of the principal and interest due the creditors and administrative fees. Payments by LP & L were deferred until the fuel was used at the plant in 1985. Acting as LP & L's conduit to credit markets not otherwise available to LP & L, the shell corporations sold commercial paper, backed by a third-party bank letter of credit, to obtain the funds they lent to LP & L.
The Tax Collector seeks use taxes, including those held in escrow, that he claims total $19,182,092.82. The Tax Collector also belatedly seeks a lease tax on LP & L's quarterly payments of principal and interest to shell corporations through which LP & L financed its purchase of the same nuclear fuel. The Tax Collector computes a lease-tax of $14,931,457.95 on these quarterly payments. He then concludes that the potential combined use and lease taxes due on the nuclear fuel amount to $34,113,550.77. The taxpayers submit that the evidence and the authorities establish that no sales/use taxes are due because nuclear fuel is entirely exempt from such taxes, and no lease tax is due on the transaction LP & L used to finance the costs of their nuclear fuel. The taxpayers [claim they] are entitled to a refund of $4,912,662.08 in sales/use taxes paid under protest on exempt nuclear fuel used between 1983 and 1990 at Waterford 3....
....
The District Court in its Judgment of April 26, 1991, found that (1) the taxpayers are entitled to a refund of the payments made under protest and interest, (2) the taxpayers are not liable for any additional use or lease taxes on Batches A through F of nuclear fuel, and (3) that future shipments of the fuel are not subject to use or lease taxes unless the *581 Louisiana Legislature modifies the application of such taxes to nuclear fuel.
(Plaintiffs-appellees' original brief at pp. 5-8, footnotes omitted.)
ISSUES
(1) Whether nuclear fuel is exempt from parochial sales and use taxes;
(2) Whether La. Const. of 1974, art. VI, § 29(D) bars the application of the exemption to St. Charles Parish taxes, in whole or in part, because certain parochial taxes were adopted and bonded before the effective date of the exemptions; and
(3) Whether the quarterly payments of principal and interest stemming from a financing transaction structured in the form of a sale/lease back are subject to the parochial lease tax.
ANALYSISISSUE ONE
This question is one of statutory construction. Pertinent law is found in La. R.S. 1:12, 1:14, and 1:15.
La.R.S. 1:12 reads, "The classification and organization of the sections of the Revised Statutes is made for the purpose of convenience, reference, and orderly arrangement, and no implication or presumption of a legislative construction shall be drawn therefrom."
La.R.S. 1:14 reads:
Unless otherwise indicated in the context, references in the Revised Statutes, Titles, Sub-titles, Chapters, Parts, Sub-parts, or Sections shall mean Titles, Sub-titles, Chapters, Parts, Sub-parts, or Sections of the Revised Statutes.
Whenever any reference is made to any portion of the Revised Statutes or any other law, the reference applies to all amendments thereto hereafter made.
La.R.S. 1:15 reads, "The repeal of a repealing law shall not revive the first law."
La.R.S. 24:253, pertinent to the powers of the Louisiana State Law Institute, reads:
In preparing the printer's copy provided for in R.S. 24:252, the Louisiana State Law Institute shall not alter the sense, meaning or effect of any act of the legislature, but it may:
(1) Renumber and rearrange sections or parts of sections;
(2) Transfer sections or divide sections so as to give to distinct subject matters a separate section number, but without changing the meaning;
(3) Insert or change the wording of headnotes;
(4) Change reference numbers to agree with renumbered chapters or sections;
(5) Substitute the proper section or chapter number for the terms "this act", "the preceding section" and the like;
(6) Strike out figures where they are merely a repetition of written words and vice-versa;
(7) Change capitalization for the purpose of uniformity;
(8) Correct manifest typographical and grammatical errors, and
(9) Make any other purely formal or clerical changes in keeping with the purpose of the revision.
The Institute shall omit all titles of acts, all enacting, resolving, and repealing clauses, all appropriation measures, all temporary statutes, all declarations of emergency, and all validity, declaration of policy, and construction clauses, except when the retention thereof is necessary to preserve the full meaning and intent of the law. Whenever any validity, declaration of policy, or construction clause is omitted, proper notation of the omission shall be made.
The State sales and use tax and lease taxes are found in La.R.S. 47:302, which provides:
A. There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein, the levy of said tax to be as follows:
(1) At the rate of two per centum (2%) of the sales price of each item or article of tangible personal property when sold at retail in this state; the tax to be computed on gross sales for the purpose of remitting the amount of tax due the *582 state, and to include each and every retail sale.
(2) At the rate of two per centum (2%) of the cost price of each item or article of tangible personal property when the same is not sold but is used, consumed, distributed, or stored for use or consumption in this state; provided there shall be no duplication of the tax.
B. There is hereby levied a tax upon the lease or rental within this state of each item or article of tangible personal property, as defined herein; the levy of said tax to be as follows:
(1) At the rate of two per centum (2%) of the gross proceeds derived from the lease or rental of tangible personal property, as defined herein, where the lease or rental of such property is an established business, or part of an established business, or the same is incidental or germane to the said business.
(2) At the rate of two per centum (2%) of the monthly lease or rental price paid by lessee or rentee, or contracted or agreed to be paid by lessee or rentee to the owner of the tangible personal property.
C. There is hereby levied a tax upon all sales of services, as herein defined, in this State, at the rate of two per centum (2%) of the amounts paid or charged for such services.
The tax levied in this Section shall be collected from the dealer, as defined herein, shall be paid at the time and in the manner hereinafter provided, and shall be, in addition to all other taxes, whether levied in the form of excise, license, or privilege taxes, and shall be in addition to taxes levied under the provisions of Chapter 3 of Subtitle II of this Title.
D. Notwithstanding any other provision of law to the contrary, no state sales or use tax nor any such tax levied by a political subdivision shall be levied on any advertising service rendered by an advertising business, including but not limited to advertising agencies, design firms, and print and broadcast media, or any member, agent, or employee thereof, to any client whether or not such service also involves a transfer to the client of tangible personal property. However, a transfer of mass-produced advertising items by an advertising business which manufactures the items itself to a client for the client's use, which transfer involves the furnishing of minimal services other than manufacturing services by the advertising business shall be a taxable sale or use of tangible personal property; provided that in no event shall tax be levied on charges for creative services which are separately invoiced.
E. No exemption from the state sales and use tax granted after the effective date of this Act and granted pursuant to the provisions of this Chapter or Chapter 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable to any sales and use tax levied by any local governmental subdivision or school board unless the state exemption specifically provides that it applies to such sales and use tax levies. In the absence of any such specific application of the state exemption to sales and use tax levies of any local governmental subdivision or school board, any state exemption granted pursuant to the provisions of this Chapter or Chapter 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable only to the levy and collection of the state sales and use tax.
F. Notwithstanding any other provision of law to the contrary, including but not limited to any contrary provisions of this Chapter, for the period August 1, 1988 through June 30, 1989, the exemptions to the tax levied pursuant to the provisions of this Section, except for those exemptions provided by R.S. 39:467 and 468, R.S. 47:305(A)(1), (B), (D)(1)(f), (j), (k), (l), (m), (s), (G), 305.1, 305.2, 305.3, 305.8, 305.15, 305.20, 305.37, 305.38, 305.46, and R.S. 51:1787, shall be inapplicable, inoperable and of no effect.
The exemptions from the state sales and use taxes of La.R.S. 47:302 are found in La.R.S. 47:305. The purpose of the sales/use tax scheme is to make all tangible personal property used or consumed in the state subject to a uniform tax burden irrespective *583 of whether it is acquired in the state, making it subject to the sales tax, or acquired without the state, making it subject to the use tax at the same rate. Chicago Bridge & Iron Co. v. Cocreham, 317 So.2d 605 (La.1975).
La. Const. art. VI, § 29 gives local government subdivisions and school boards the right to levy sales/use and lease taxes of their own in addition to the one levied by the State. The State has also retained the right to exempt certain goods taxed by the State from local taxes. La. Const. art. VI, § 29 reads:
Section 29. (A) Sales Tax Authorized. Except as otherwise authorized in a home rule charter as provided for in Section 4 of this Article, the governing authority of any local governmental subdivision or school board may levy and collect a tax upon the sale at retail, the use, the lease or rental, the consumption, and the storage for use or consumption, of tangible personal property and on sales of services as defined by law, if approved by a majority of the electors voting thereon in an election held for that purpose. The rate thereof, when combined with the rate of all other sales and use taxes, exclusive of state sales and use taxes, levied and collected within any local governmental subdivision, shall not exceed three percent.
(B) Additional Sales Tax Authorized. However, the legislature, by general or by local or special law, may authorize the imposition of additional sales and use taxes by local governmental subdivisions or school boards, if approved by a majority of the electors voting thereon in an election held for that purpose.
(C) Bonds; Security. Nothing in this Section shall affect any sales or use tax authorized or imposed on the effective date of this constitution or affect or impair the security of any bonds payable from the proceeds of the tax.
(D) Exemptions; Protection of Bonds. Except when bonds secured thereby have been authorized, the legislature by law may uniformly exempt or exclude any goods, tangible personal property, or services from sales or use taxes levied by local governmental subdivisions, school boards, and the state.
As amended in 1978, La.R.S. 33:2716.1 requires the State to specifically provide whether an exemption to a state tax also exempts the same activities/goods from a parallel local government subdivision and school board tax. La.R.S. 33:2716.1 reads:
(A) After any sales tax revenue bonds of any local governmental subdivision, as defined in Article VI, Section 44(1) of the Louisiana Constitution, or any school board have been authorized, no sales tax exemptions created after the authorization of those bonds, shall apply to the sales and use tax dedicated as security for said bonds.
(B) No exemption from the state sales and use tax granted subsequent to the effective date of this Act and granted pursuant to the provisions of Chapters 2 or 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable to any sales and use tax levied by any local governmental subdivision or school board unless the state exemption specifically provides that it applies to such sales and use tax levies. In the absence of any such specific application of the state exemption to sales and use tax levies of any local governmental subdivision or school board, any state exemption granted after the effective date of this Act and granted pursuant to the provisions of Chapters 2 or 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable only to the levy and collection of the state sales and use tax.
An exemption from taxation, being an exceptional privilege, must be clearly, unequivocally, and affirmatively established. Meyers v. Flournoy, 25 So.2d 601 (La.1946). Statutes granting tax exemptions are to be strictly construed because they grant an exceptional privilege, and should be construed against the tax payer. McNamara v. Central Marine Serv., Inc., 507 So.2d 207 (La.1987).
The 1973 amendment to La.R.S. 47:305 exempted for the first time from sales/use tax fuel oil and coal when used for boiler *584 fuel. In 1980, La.R.S. 47:305 was amended to exempt from the state sales and use tax "[a]ll energy sources when used for boiler fuel except refinery gas when used for boiler fuel."[1]
Prior to 1984, La.R.S. 47:305 was divided into numerical subdivisions or paragraphs. The two pertinent exemptions were found at 47:305(4). Paragraph (4) actually consisted of two grammatical paragraphs. The exemptions pertinent to this case were located in the first grammatical paragraph. The language extending the exemption from state taxes to the local government and school board taxes was found in the second grammatical paragraph of paragraph (4). It appears that this language extending the exemption first became part of the statute in Acts 1980, No. 159. This language is found in the last sentence of the second grammatical paragraph of La. R.S. 47:305(4).
In Acts 1984, No. 183, the paragraphs of La.R.S. 47:305 were renumbered. Substantively, the exemptions found in paragraph (4) remained the same; however, they were now numbered 47:305(4)(a)(iv) and (viii) respectively. The language which extended the exemptions to "local" taxes was no longer found as the last sentence of the second grammatical paragraph of paragraph (4), but had been renumbered 47:305(4)(f). Structurally, its place within paragraph (4) was not altered, but it was given its own letter heading(f)because both grammatical paragraphs of paragraph (4) were broken up into six separate sections numbered (a) thru (f). This exemption matching language still formed the last sentence of R.S. 47:305(4).
Acts 1985, No. 258, changed the exemption regarding refinery gas. Specifically, it amended only La.R.S. 47:305(4)(a)(vii) and (viii). It did not change or amend the other exemptions, except for specifically providing a tax schedule on refinery gas. Acts 1985, No. 530, amended and re-enacted only R.S. 47:305(4)(a)(xi) and (xiii) and 4(d). Importantly, R.S. 47:305(4)(a)(iv) and (viii) were not amended nor was the language extending these exemptions to the "local" taxes, paragraph 4(f), amended by this Act. Therefore, the previous language remained intact.
In 1986, the Louisiana State Law Institute, pursuant to the authority granted it by La.R.S. 24:253, renumbered the sections of R.S. 47:305. Paragraph (4) became (D) and the pertinent exemptions became numbered 47:305(D)(1)(d) and (h). The exemption language, formerly (4)(f), became (D)(6).
Bearing the time frame of the amendments of La.R.S. 47:305 in mind, we now look to the wording of the exemptions to decide if nuclear fuel assemblies are included in the exemptions. The first nuclear fuel assemblies arrived in St. Charles Parish in 1983, and arrived in Batches A, B, and C. In 1983, R.S. 47:305(4) stated:
(4) The sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this Chapter: gasoline; steam, water (not including mineral water or carbonated water or any water put in bottles, jugs, or containers, all of which are not exempted); electric power or energy, and any materials and energy sources used to fuel the generation of electric power; newspapers; fertilizers and containers used for farm products when sold directly to the farmer; natural gas; all energy sources when used for boiler fuel except refinery gas when used for boiler fuel; new trucks, new automobiles, and new aircraft withdrawn from stock by factory authorized new truck, new automobile, and new aircraft dealers, with the approval of the secretary of the Department of Revenue and Taxation titled in the dealer's name for use as demonstrators; drugs prescribed by a licensed physician or dentist, orthotic and prosthetic devices and wheelchairs prescribed by *585 physicians or licensed chiropractors for personal consumption or use; the sale or purchase of any ostomy, ileostomy, or colostomy device or any other appliance, including catheters, or related item which is required as the result of any surgical procedure by which an artificial opening is created in the human body for the elimination of natural waste; patient aids prescribed by a physician or licensed chiropractor for home use; food sold for preparation and consumption in the home, including by way of extension and not of limitation, bakery products; dairy products; soft drinks; fresh fruits and vegetables; and package foods requiring further preparation by the purchaser are exempt from the tax imposed by this Chapter. Sales of meals furnished to the staff and students of educational institutions, including kindergartens; the staff and patients of hospitals; the staff, inmates, and patients of mental institutions; boarders of rooming houses, and occasional meals furnished in connection with or by educational, religious, or medical organizations are exempt from the taxes imposed by this Chapter, if the meals are consumed on the premises where purchased; however, sales by any of the above in facilities open to outsiders or to the general public are not exempt from the taxes imposed by this Chapter. Food sales by restaurants, drive-ins, snack bars, candy and nut counters, private clubs, and sales made by an establishment not specifically exempted elsewhere, who furnish facilities for the consumption of the food on the premises, are not exempt from the taxes imposed by this Chapter.
The exemption for food and drugs, orthotic and prosthetic devices, and wheelchairs prescribed by physicians or licensed chiropractors for personal consumption or use, for patient aids prescribed by a physician or licensed chiropractor for home use and, ostomy, ileostomy, or colostomy devices or other appliances, including catheters, or related items required as the result of any surgical procedure by which an artificial opening is created in the human body for the elimination of natural waste, applies only to sales taxes imposed by the state of Louisiana and does not apply to such taxes authorized and imposed by any school board, municipality, or other local taxing authority, notwithstanding any other provisions of law to the contrary and specifically, but not exclusively, R.S. 33:2716.1. However sales taxes authorized and imposed by any school board, municipality, or other local taxing authority shall not apply to the sale of prescription drugs under the pharmaceutical vendor program of Title XIX of the Social Security Act as administered by the Department of Health and Human Resources of the state of Louisiana. The exemptions from the state sales and use tax provided in this Paragraph shall be applicable to any sales and use tax levied by any local governmental subdivision or school board, except as otherwise specifically provided in this Paragraph.
(Emphasis added.)
The nuclear fuel assemblies clearly fit under both exemption (4)(a)(iv) and (4)(a)(viii) (which are now numbered (D)(1)(d) and (h)).
St. Charles argues next that the "exemption matching" language, originally found in grammatical paragraph (2) of La. R.S. 47:305(4) and presently located in R.S. 47:305(D)(6), while providing some exemptions to local government subdivisions and school board taxes, does not apply to the exemptions listed in grammatical paragraph (1) of 47:305(4), where the pertinent exemptions were located prior to the "breakup" and renumbering of R.S. 47:305. However, a close reading of Acts 1980, No. 159, shows why such an interpretation is erroneous. First, the introductory language expresses the intent of the Legislature to amend and re-enact paragraph (4) of R.S. 47:305. Paragraph (4) logically refers to the Section 4 in its entirety, both grammatical paragraphs. Second, the second grammatical paragraph does not establish any exemptions. All of the exemptions to the state tax are found in paragraph (1). Paragraph (2) does two things. First, it declares that the exemption on food, drugs, *586 and certain medical devices, which were created in paragraph (1), does not apply to "local" taxes. Second, paragraph (2) contains the exemption matching language that extends the exemptions to the state tax to the local tax, unless otherwise specifically provided for by that paragraph. There are no exemptions in paragraph (2) to which the exemption matching language could apply. The only logical reading of the statute is to apply the exemption matching language of paragraph (2) to the exemptions established in paragraph (1). If we read La.R.S. 47:305(4) as does St. Charles, the exemption matching language found in paragraph (2) would apply to no exemptions whatsoever. Accordingly, we conclude the exemption matching language found in paragraph (2) of R.S. 47:305(4) and later in 47:305(D)(6) logically extends the pertinent exemptions to the local government subdivisions and school board of St. Charles Parish. Therefore, the nuclear fuel assemblies could never have been a part of the St. Charles Parish tax base.
ANALYSISISSUE TWO
In 1988, the Legislature first suspended several of the exemptions found in La.R.S. 47:305(D), which have been subsequently renewed. All of the exemptions found in R.S. 47:305(D) were suspended with the exception of those specifically listed in R.S. 47:302(F), (G) and (H). In 1988, the exemptions pertinent to this matter were found at R.S. 47:305(D)(1)(d) and (h); therefore, these items became subject to the state sales and use tax by the clear wording of R.S. 47:302(F), (G) and (H). St. Charles argues that this legislation also suspended the exemption regarding its local taxes, thus making the nuclear fuel assemblies subject to local tax. However, if this is true, the exemption would be suspended only as to Batch F of the nuclear fuel assemblies, because it arrived in St. Charles Parish in 1989.
As noted previously, La. Const. art. VI, § 29 grants the State the specific right to exempt property and activities from "local" taxes, except for previously authorized bonds which are dependent upon such "local" tax. Section 29(D) would prevent the exemption matching language of La.R.S. 47:305(D)(6) from applying to the nuclear fuel assemblies if they were part of the tax base upon which St. Charles Parish had funded certain bond issues. The question is whether the Legislature, in suspending the state sales/use tax exemption, also suspended the exemption to the local tax.
The first act suspending the exemptions is Acts 1988, No. 842. The pertinent language is found in Section 1.
To enact R.S. 47:302(F), relative to the sales and use tax, to provide relative to the effectiveness of exemptions to the tax, and to provide for related matters.
Be it enacted by the Legislature of Louisiana:
Section 1. R.S. 47:302(F) is hereby enacted to read as follows:
§ 302. Imposition of tax
* * * * * *
F. Notwithstanding any other provision of law to the contrary, including but not limited to any contrary provisions of this Chapter, for the period August 1, 1988 through June 30, 1989, the exemptions to the tax levied pursuant to the provisions of this Section, except for those exemptions provided by R.S. 47:305(A)(1), (B), (D)(1)(f), (j), (k), (l), (m), (s), (G), 305.1, 305.2, 305.3, 305.8, 305.15, 305.20, 305.37, 305.38, 305.46, and R.S. 51:1787, shall be inapplicable, inoperable and of no effect.
(Emphasis added.)
The underlined language clearly shows that the suspension applies only to the taxes levied by "this Section" or Section 302 of Title 47. No parish taxes are levied by Section 302; parish taxes are levied by local ordinances. Therefore, if we look at the clear meaning of the words "this Section," it would follow that only the state tax levied by Section 302 is meant.
In the subsequent legislative acts that extend the exemptions, the introductory language is clearer. The introductory language of Acts 1990, No. 386 specifically says "relative to the state sales and use taxes" and does not mention any local taxes. Again, the suspension language itself *587 found in Section 1 of the Acts specifically refers to "the tax levied pursuant to the provisions of this Section," which can only mean La.R.S. 47:302. Therefore, this assignment has no merit.
ANALYSISISSUE THREE
St. Charles claims that the fuel leases between LP & L and Bayou Fuel (River Fuel later) are subject to the lease tax imposed by La.R.S. 47:302(B) and parallel parish ordinances. LP & L argues that the contracts were financing agreements, not true leases, and, thus, are not subject to the lease tax.
The lease tax is found in La.R.S. 47:302(B). The lease tax is not subject to the exemptions of R.S. 47:305(D). Therefore, the main question is whether R.S. 47:302(B) imposes a tax on the fuel leases. We re-emphasize, as previously stated, statutes imposing taxes are liberally construed in favor of taxpayers. A lease is defined in La.C.C. art. 2669: "Lease or hire is a synallagmatic contract, to which consent alone is sufficient, and by which one party gives to the other the enjoyment of a thing, or his labor, at a fixed price." (Emphasis supplied.)
Other pertinent La.Civil Code articles include:
Art. 2673. Kinds of lease
There are two species of contracts of lease, to wit:
1. The letting out of things.
2. The letting out of labor or industry.
Art. 2674. Lease of things
To let out a thing is a contract by which one of the parties binds himself to grant to the other the enjoyment of a thing during a certain time, for a certain stipulated price which the other binds himself to pay him.
Art. 2678. Lease of corporeal things
All corporeal things are susceptible of being let out, movable as well as immovable, excepting those which can not be used without being destroyed by that very use.
Art. 2720. Return of things leased without inventory
If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article.
A lease is also defined by La.R.S. 47:301(7)(a), (b), and (c):
(a) "Lease or rental" means the leasing or renting of tangible personal property and the possession or use thereof by the lessee or renter, for a consideration, without transfer of the title of such property. For the purpose of the leasing or renting of automobiles, "lease" means the leasing of automobiles and the possession or use thereof by the lessee, for a consideration, without the transfer of the title of such property for a one hundred eighty-day period or more. "Rental" means the renting of automobiles and the possession or use thereof by the renter, for a consideration, without the transfer of the title of of such property for a period less than one hundred eighty days.
(b) The term "lease or rental", however, as herein defined, shall not mean or include the lease or rental made for the purposes of re-lease or re-rental of casing tools and pipe, drill pipe, tubing, compressors, tanks, pumps, power units, other drilling or related equipment used in connection with the operating, drilling, completion, or reworking of oil, gas, sulphur, or other mineral wells.
(c) The term "lease or rental", as herein defined shall not mean or include a lease or rental of property to be used in performance of a contract with the United States Department of the Navy for construction or overhaul of U.S. Naval vessels.
Also pertinent is the Louisiana Lease of Movables Act, La.R.S. 9:3302-9:3342. The Louisiana Lease of Movables Act defines the distinction between a true lease and a financed lease. The financed lease is one that is entered into as a security for the transaction. See La.R.S. 9:3306(12). The Lease of Movables Act was passed in 1985. However, provisions of this Act are remedial in nature and shall *588 apply to leases of movables in existence on the effective date of the Act. The fuel leases were confected before the effective date of the Act.
Louisiana generally recognizes the substance of a transaction over the form. Easy T.V. & Appliance Rental of La., Inc. v. Secretary of Dep't of Revenue and Taxation, 556 So.2d 100 (La.App. 4th Cir.1990), writ denied, 559 So.2d 1375 (La.1990); Compass Offshore, Inc. v. McNamara, 526 So.2d 425 (La.App. 4th Cir.1988); Cajun Contractors, Inc. v. State, Dep't of Revenue and Taxation, 515 So.2d 625 (La.App. 1st Cir.1987); McNamara v. Electrode Corp., 418 So.2d 652 (La.App. 1st Cir.1982), writ denied, 420 So.2d 986 (La.1982).
La.R.S. 47:302 does not specify the type of lease subject to taxation. Nor does it distinguish financed leases from true leases. Nor does the Lease of Movables Act provide for any special taxation in connection with a financed lease.
During the trial, the record shows LP & L introduced a letter from the Louisiana Department of Revenue and Taxation, which clearly states, "The Louisiana Department of Revenue and Taxation will not pursue the issue of `Leased fuel' and will recognize the transaction as a financing agreement." Furthermore, LP & L elicited substantial testimony showing that the reality of the transaction was simply a financing arrangement, which appeared only as a lease in form. The testimony showed further that this form was the usual and common form used when arranging financing agreements of this nature. We note in addition that the fact that the fuel assemblies by nature were consumed by use violates the requirements of La.C.C. art. 2720.
On the other hand, St. Charles simply notes that the parties went out of their way to avoid calling the transaction a lease, but did so numerous times at trial. We note that the lease form was used and lease terms used throughout the document.
After careful review of our statutory law and the testimony and evidence addressed at trial, it is readily apparent this is a res nova question. That question is whether La.R.S. 47:302 refers only to true leases or encompasses this transaction, which we find is, in reality, a financing agreement regarding a sale. Therefore, after a plain reading of the statute and footnoting the legislative intent, we can only logically conclude that this transaction is outside the purview of Louisiana's lease tax scheme. Ergo, the trial court was eminently correct.
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellants.
AFFIRMED.
NOTES
[1] This exemption appeared in the first grammatical paragraph of 47:305(4), which, at that time, consisted of two grammatical paragraphs.